## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMY T. SCHWARTZ & STEPHEN A. SCHWARTZ,<br>1722 Cedarbrook<br>Glenbrook, Nevada 89413<br><br>Individually And<br>On Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>  vs.<br><br>MALLINCKRODT PLC,<br>675 McDonnell Blvd.<br>Hazelwood, MO 63042<br><br>and MARK TRUDEAU,<br>c/o Mallinckrodt PLC<br>675 McDonnell Blvd.<br>Hazelwood, MO 63042<br><br>     Defendants. | CIVIL ACTION NO. _____<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br><br><br>__JURY TRIAL DEMANDED__ |

## INTRODUCTION

1.  This is a federal class action on behalf of all persons who purchased or otherwise acquired securities of Mallinckrodt, PLC ("Mallinckrodt" or the "Company") between **July 14, 2014 and January 18, 2017** inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). As alleged herein, Defendants published a series of materially false and misleading statements that Defendants knew and/or recklessly disregarded were materially false and misleading at the time of such publication, and that omitted to reveal material information necessary to make Defendants' statements, in light of such material omissions, not materially false and misleading.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). The Company conducts a substantial amount of business in this District. Furthermore, a significant portion of the events giving rise to these claims took place in this District. The Company entered into a settlement with the FTC which was filed in this District. *See* Joint Mot. for Entry of Stipulated Order for Perm. Inj. & Equitable Monetary Relief, *Federal Trade Comm'n, et al. v. Mallinckrodt ARD Inc., et al*., No. 1:17-cv-00120, ECF No. 2 (D.D.C. Jan. 18, 2017).

5.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

**Plaintiffs**

6.      Plaintiffs Amy T. Schwartz and Stephen A. Schwartz are a married couple who, as set forth in the accompanying certification, incorporated by reference herein, acquired securities of Mallinckrodt at artificially inflated prices during the Class Period and have been damaged thereby.

**Defendants**

7.     Defendant Mallinckrodt, PLC is a corporation organized under the laws of Ireland, and based in Staines-upon-Thames, England. Mallinckrodt has U.S. headquarters located in St. Louis, Missouri. Shares of Mallinckrodt common stock trade on the New York Stock Exchange under the symbol "MNK."

8.     Defendant Mark Trudeau ("Trudeau") is and, throughout the Class Period, was the Company's CEO.

9.     Trudeau, because of his position within the Company, possessed the power and authority to control the contents of Mallinckrodt's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. He was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position within the Company, and his access to material non-public information, Trudeau knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. Trudeau is liable for the false and misleading statements pleaded herein.

10.     Defendants are each liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on acquirers of Mallinckrodt securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Mallinckrodt's revenues, business, operations, management and the intrinsic value of Mallinckrodt's assets and securities; (ii) enabled Defendants to artificially inflate the price of Mallinckrodt securities; and (iii) caused

Plaintiffs and other members of the Class to acquire Mallinckrodt securities at artificially inflated prices.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

11.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired securities of Mallinckrodt between **July 14, 2014 and January 18, 2017** inclusive (the "Class") and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

12.     The members of the Class are so numerous that joinder of all members is impracticable. Mallinckrodt's securities were actively traded within the United States on the New York Stock Exchange throughout the Class Period. The Company has approximately 104 million shares of common stock issued and outstanding that trade in the US in efficient markets. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Mallinckrodt or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

13.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

14.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

15.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Mallinckrodt; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

16.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Events Leading Up To The Class Period

17.     On April 7, 2014, the Company announced that they had entered into a definitive merger agreement under which Mallinckrodt would acquire Questcor Pharmaceuticals, Inc. in exchange for approximately $5.6 billion in cash and shares of the Company's common stock. In

5

its press release, as filed with the SEC, Mallinckrodt highlighted the acquisition of two drugs, HP

Acthar Gel ("Acthar") and Synthacten:

> H.P. Acthar Gel (repository corticotropin injection) is an injectable drug approved by the FDA for 19 indications. Increasingly used in the management of difficult-to-treat autoimmune and inflammatory conditions, Acthar comprises substantially all of Questcor's net sales and is primarily prescribed for the treatment of multiple sclerosis relapses in adults, proteinuria associated with nephrotic syndrome, certain rheumatology-related conditions, and infantile spasms. Questcor also provides specialty contract manufacturing services to the global pharmaceutical industry through its wholly-owned subsidiary BioVectra Inc.

> Additionally, in June of 2013, Questcor acquired rights from Novartis Pharma AG and Novartis AG to develop and commercialize Synacthen and Synacthen Depot in the U.S. and certain countries outside the U.S. Questcor is currently in the early stages of evaluating Synacthen in several potential indications being considered for possible U.S. clinical development.

18.     Defendant Trudeau similarly boasted of the benefits of the merger, specifically

noting the benefits of Acthar to Mallinckrodt's future business operations. He stated on April 7,

2014 that:

> We believe this transaction will provide a strong and sustainable platform for future revenue and earnings growth, and provide exceptional value for shareholders of both Mallinckrodt and Questcor. It will substantially increase the scale, diversification, cash flow and profitability of our business, while expanding and enhancing the breadth and depth of our specialty pharmaceutical platform. With Questcor, combined with our recently completed acquisition of Cadence Pharmaceuticals, the new Mallinckrodt will have a significant, established presence with prescribers, payers and hospitals. We will also have an increasingly diversified specialty pharmaceuticals portfolio, which will include novel therapeutics for pain management, as well as central nervous system, renal, rheumatologic and other autoimmune and inflammatory disorders.

> After significant due diligence, we have concluded that Questcor is another ideal strategic fit with Mallinckrodt. Questcor's expertise and proprietary manufacturing know-how has allowed the company to provide patients with a unique product that addresses some of the most complex and challenging therapeutic areas within specialty medicine. Acthar is increasingly being employed by specialty physicians in the treatment of a range of serious, difficult-to-treat autoimmune and inflammatory conditions, where patients often have exhausted other good therapeutic options. With the exceptional talent and

expertise Questcor brings, combined with the financial strength, portfolio breadth and geographic reach of the combined company, we believe we are now well on our way to becoming a leader in the development and commercialization of specialty therapeutics around the world.

19.     On June 11, 2014, Questcor received a subpoena and Civil Investigative Demand ("CID") from the Federal Trade Commission ("FTC") seeking documentary materials and information regarding the FTC's investigation into whether Questcor's acquisition of certain rights to develop, market, manufacture, distribute, sell and commercialize Synacthen from Novartis AG and Novartis Pharma AG violates antitrust laws.

### Defendants' Materially False and Misleading
### Statements During the Class Period

20.     On July 14, 2014, the beginning of the Class Period, Questcor and Mallinckrodt each separately filed a joint definitive proxy statement with the SEC in anticipation of votes by shareholders for each company regarding whether to approve the merger. In no portion of either Questcor or Mallinckrodt's definitive proxies did either company disclose the investigation or subpoena from the FTC. Instead, the Definitive Proxies listed various risk factors for Mallinckrodt relating to Achtar and Synthacten as follows:

These factors include risks and uncertainties related to, among other things: general economic conditions and conditions affecting the industries in which Mallinckrodt and Questcor operate; the commercial success of Mallinckrodt's and Questcor's products, including H.P. Acthar® Gel; Mallinckrodt's and Questcor's ability to protect intellectual property rights; the parties' ability to satisfy the merger agreement conditions and consummate the merger on the anticipated timeline or at all; the availability of financing, including the financing contemplated by the debt commitment letter, on anticipated terms or at all; Mallinckrodt's ability to successfully integrate Questcor's operations and employees with Mallinckrodt's existing business; the ability to realize anticipated growth, synergies and cost savings; Questcor's performance and maintenance of important business relationships; the lack of patent protection for Acthar, and the possible FDA approval and market introduction of additional competitive products; Questcor's reliance on Acthar for substantially all of its net sales and profits; Questcor's ability to continue to generate revenue from sales of Acthar to treat on-label indications associated with nephrotic syndrome, multiple sclerosis, infantile spasms or rheumatology-related conditions, and Questcor's ability to

develop other therapeutic uses for Acthar; volatility in Questcor's Acthar shipments, estimated channel inventory, and end-user demand; an increase in the proportion of Questcor's Acthar unit sales comprised of Medicaid-eligible patients and government entities; Questcor's research and development risks, including risks associated with Questcor's work in the areas of nephrotic syndrome and Lupus, and Questcor's efforts to develop and obtain FDA approval of Synacthen Depot…

21.     The statements referenced in ¶ 20 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's future business prospects and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that Acthar's financial viability was tied in large part to monopolistic and anticompetitive actions by Questcor aimed towards preventing a synthetic version of ACTH to reach the U.S. market. Moreover, the Company failed to disclose that Questcor's illegal anticompetitive conduct was under investigation by the FTC and that Mallinckrodt would later be forced to abandon such anti-competitive measures.

22.     On August 14, 2014, the shareholders for both Questcor and Mallinckrodt approved the merger. One the same day, the Company announced shareholder approval of the merger and completion of the merger.

23.     On November 25, 2014, the Company stated in its 2014 Form 10-K filed on this date that Acthar "has limited direct competition due to the unique nature of the product." The 2014 Form 10-K also stated that

The composition patent for Acthar has expired and we may have no patent-based market exclusivity with respect to any indication or condition we might target. We rely on trade secrets and proprietary know-how to protect the commercial viability and value of Acthar. We currently obtain such protection, in part, through confidentiality and proprietary information agreements. These agreements may not provide meaningful protection or adequate remedies for proprietary technology in the event of unauthorized use or disclosure of confidential and proprietary information.

\*                     \*                     \*

8

[F]ollowing our acquisitions of Cadence and Questcor, both of which were completed in fiscal 2014, we expect that a small number of products, most notably Acthar and to a lesser extent, Ofirmev, will represent a significant percentage of our net sales. Our ability to maintain and increase net sales from these products depends on several factors, including:

- our ability to increase market demand for products through our own marketing and support of our sales force;

- our ability to implement and maintain pricing actions and continue to maintain or increase market demand for these products;

- our ability to maintain confidentiality of the proprietary know-how and trade secrets relating to Acthar;

- our ability to maintain and defend the patent protection and regulatory exclusivity of Ofirmev;

- our ability to continue to procure a supply of Acthar and Ofirmev from internal and third-party manufacturers in sufficient quantities and at acceptable quality and pricing levels in order to meet commercial demand;

- our ability to maintain fees and discounts payable to the wholesalers and distributors and group purchasing organizations, at commercially reasonable levels;

- whether the Federal Trade Commission ("FTC"), Department of Justice ("DOJ") or third parties seek to challenge and are successful in challenging patents or patent-related settlement agreements or our sales and marketing practices;

- warnings or limitations that may be required to be added to FDA-approved labeling;

- the occurrence of adverse side effects related to or emergence of new information related to the therapeutic efficacy of these products, and any resulting product liability claims or product recalls; and

- our ability to achieve hospital formulary acceptance, and maintain reimbursement levels by third-party payors.

Moreover, net sales of Acthar may also be materially impacted by the decrease in the relatively small number of prescriptions written for Acthar as compared to other products in our portfolio, given Acthar's use in treating rare diseases. Any disruption in our ability to generate net sales from Acthar could have an adverse impact on our business, financial condition, results of operations and cash flows.

24.     In the Company's November 25, 2014 10-K, the Company also announced for the first time that it was under investigation by the FTC for possible violations of antitrust law. The 10-K stated: "Questcor received a subpoena and Civil Investigative Demand ("CID") from the Federal Trade Commission ("FTC") seeking documentary materials and information regarding the FTC's investigation into whether Questcor's acquisition of certain rights to develop, market, manufacture, distribute, sell and commercialize Synacthen Depot from Novartis violates the antitrust laws."

25.     The statements referenced in ¶¶ 23-24 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that Acthar's "commercial viability" was dependent on Questcor and Mallinckrodt's illegal anticompetitive conduct in  preventing a synthetic version of ACTH to reach the U.S. market.

26.     With respect to Medicare and Medicaid reimbursement levels, the 2014 Form 10-K stated that "federal and state governments may continue to enact measures in the future aimed at containing or reducing payment levels for prescription pharmaceuticals paid for in whole or in part with government funds. We cannot predict the nature of such measures, which could have material adverse consequences for the pharmaceutical industry as a whole and, consequently, also for us."

27.     The statements referenced in ¶26 were further materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the true nature of, and specific risks to, Mallinckrodt due its exposure to Medicare and Medicaid reimbursement levels. Specifically, the Company faced extreme exposure to reductions in reimbursement levels

by these programs. As a result, the Company's statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

28.     On October 6, 2015, Mallinckrodt held a guidance call with investors. During the call, Trudeau was asked about the company's reliance on Medicare for revenues for Acthar, and stated:

> So with regards to your question on Medicare exposure to Acthar, a couple of things. One, if we look at our overall business, the combined proportion of our business that goes through Medicare and Medicaid combined it's about a quarter of our business, roughly. ***Acthar is maybe a little higher than that.*** But in general, our business is about a quarter.

[Emphasis added]

29.     The statements referenced in ¶28 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining the total percentage of Acthar sales attributable to Medicare. As the Citron Report revealed on November 16, 2016, the percentage of Acthar sales for 2014 attributable to Medicare alone was over 45%, and the total percentage of Acthar revenue attributable to both Medicare and Medicaid was over 60%. Furthermore, Defendants failed to disclose that the total percentage of Acthar sales attributable to Medicare *increased* in 2015, with sales attributable to Medicare alone totaling 48%, and the total percentage of Acthar revenue attributable to both Medicare and Medicaid totaling 61%. As a result, Trudeau's statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

30.     On November 9, 2015, Citron Research issued a statement on Twitter that compared Mallinckrodt to Valeant Pharmaceuticals International, Inc., and specifically targeted the Company's reimbursement levels, including from Medicare and Medicaid. The Citron

comment stated that "[a]t these prices $MNK has signif more downside than $VRX-- far worse offender of the reimb sys - more to follow. VRX can't live in a vacuum."

31.     After the Citron comment, Mallinckrodt's stock price fell 17% from a close of $69.89 per share on November 6, 2015, to close at $58.01 per share on November 9, 2015.

32.     Any further decline in Mallinckrodt's stock price was prevented when Trudeau falsely rebutted Citron's arguments, proclaiming that "the facts he quoted were mostly, if not completely wrong" and "we are fully confident in our business model and remain focused on executing on our long-term growth strategy."

33.     The statements referenced in ¶ 32 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that the Company's business operations were dependent on illegal, anticompetitive conduct in preventing a synthetic version of ACTH to reach the U.S. market. Moreover, the Company's actions, dating back to Questcor's management of Acthar, was under investigation by the FTC for possible anticompetitive violations.

34.     On November 24, 2015, the Company filed its 2015 Form 10-K, in which the company repeated its statements regarding the commercial viability of Acthar and the risk factors involved. Specifically, the 2015 Form 10-K stated:

> The composition patent for Acthar has expired and we have no patent-based market exclusivity with respect to any indication or condition we might target. We rely on trade secrets and proprietary know-how to protect the commercial viability and value of Acthar. We currently obtain such protection, in part, through confidentiality and proprietary information agreements. These agreements may not provide meaningful protection or adequate remedies for proprietary technology in the event of unauthorized use or disclosure of confidential and proprietary information. The parties may not comply with or may breach these agreements. Furthermore, our trade secrets may otherwise become known to, or be independently developed by, competitors.

                    *                    *                    *

Our ability to maintain and increase net sales from these products depends on several factors, including:

- our ability to increase market demand for products through our own marketing and support of our sales force;

- our ability to implement and maintain pricing and continue to maintain or increase market volume demand for these products;

- our ability to maintain confidentiality of the proprietary know-how and trade secrets relating to Acthar;

- our ability to maintain and defend the patent protection and regulatory exclusivity of Ofirmev and Inomax;

- our ability to continue to procure raw materials or finished goods, as applicable, of Acthar, Ofirmev, Inomax and Therakos immunotherapy from internal and third-party manufacturers in sufficient quantities and at acceptable quality and pricing levels in order to meet commercial demand;

- our ability to maintain fees and discounts payable to the wholesalers and distributors and group purchasing organizations, at commercially reasonable levels;

- whether the FTC, DOJ or third parties seek to challenge and are successful in challenging patents or patent-related settlement agreements or our sales and marketing practices;

- warnings or limitations that may be required to be added to FDA-approved labeling;

- the occurrence of adverse side effects related to or emergence of new information related to the therapeutic efficacy of these products, and any resulting product liability claims or product recalls; and

- our ability to achieve hospital formulary acceptance, and maintain reimbursement levels by third-party payers

35.    The statements referenced in ¶ 34 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically,

Defendants failed to disclose that Acthar's "commercial viability" was dependent on Questcor and Mallinckrodt's illegal anticompetitive conduct in preventing a synthetic version of ACTH to reach the U.S. market.

36.     The statements referenced in ¶ 34 were further materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the true nature of, and specific risks to, Mallinckrodt due its exposure to Medicare and Medicaid reimbursement levels. Specifically, the Company faced extreme exposure to reductions in reimbursement levels by these programs. As a result, the Company's statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUE FINANCIAL AND OPERATIONAL CONDITION
## OF MALLINCKRODT IS BELATEDLY DISCLOSED

37.     On November 14, 2016, the Centers for Medicare and Medicaid Services released its updated drug spending dashboard for 2015. The 2015 data revealed that Medicare spending on Acthar had increased from $391.19 million in 2014, to $503.99 million in 2015, and that combined Medicare and Medicaid spending on Acthar increased from $518.027 million in 2014, to $648.565 million in 2015. For 2015, Medicare and Medicaid spending accounted for 61.32% of total revenue from Acthar. This was a slight increase from 2014 when the percentage of Acthar revenue from Medicare and Medicaid was 60.2%.

38.     On November 16, 2016, Citron published the Citron Report, which analyzed the 2015 CMS drug pricing data and concluded that Trudeau's statements on October 6, 2015, regarding the percentage of Acthar sales attributable to Medicare were false. The Citron Report revealed to the market that Acthar sales attributable to Medicare were over 48%, while the percentage of Acthar sales attributable to both Medicare and Medicaid totaled over 61%. This

directly contradicted Trudeau's earlier statements that the percentage of 2015 was "maybe a little higher than" 25%.

39.     After publication of the Citron Report, Mallinckrodt's stock price fell 18.4% from a close of $67.80 per share on November 15, 2016, to close at $55.32 per share on November 17, 2016.

40.     On November 29, 2016, Mallinckrodt released its fourth quarter 2016 earnings results, and held a conference call with investors. In his opening remarks, Trudeau acknowledged that Medicare played a large role in the growth of Achtar's business:

> We continue to advance our Acthar market access strategy and engage with key payers. Acthar now has nearly 60% of commercial lives under contract and we see potential for more. We're continuing to find ways to partner with payers to improve appropriate patient access. Overall contract performance has aligned with our expectations, in forming our current efforts as we seek to further expand the percentage of covered lives under contract. ***As we expand patient access in pulmonology and rheumatology, our patient mix has shifted more toward older patients, many of whom are covered by Medicare***. Based on our commercial and contracting momentum and data results, we remain confident in our long-term normalized growth rate expectations for this product in the mid-single to low double-digit range.

[Emphasis Added]

41.     During the same call, analysts questioned the Company regarding its dependence on Medicare for Acthar revenue growth:

> Analyst [Marc Goodman (UBS)]: For Acthar, just helps [sic] us understand better how much of the [commercial payer] contracting has already kicked in and is impacting the business so far. I'm just trying to understand, you keep increasing commercial contracting, yet the Medicare piece of the business is going up. I heard you comment about the older patients with these indications that seem to be growing. So I understand that part. But I just don't understand why that piece of the business is increasing so fast and yet the commercial business is increasing so fast.

42.     Trudeau's response to the question from Marc Goodman conceded that Acthar was becoming increasingly dependent on treatment of older people, and therefore Medicare. Specifically, Defendant Trudeau stated:

> It should be expected that the proportion of our business that is paid for by Medicare would increase, given the fact that we are changing the mix of our business, much more towards things like rheumatoid arthritis and pulmonary sarcoidosis, which typically affect older people.

43.     Hugh O'Neill ("O'Neill"), an Executive Vice President and President of Autoimmune & Rare Diseases at the Company, noted that "[a]s it relates to the shift in the payer mix," "there's nothing here that's happening I think that we were surprised by." Mr. O'Neill's statements confirmed that the Company knew about the increase in Medicare payments for Acthar and that Trudeau's October 6, 2015 statements were false when made.

44.     Analysts also highlighted Trudeau's earlier misleading statements about the Company's Medicare exposure with Acthar. For example, Gregg Gilbert of Deutsche Bank asked:

> Do you see any risks associated with the amounts or the growth in that channel that would trigger a process or extra scrutiny by the government? I think there's obviously been some controversy in the market not only about your potential mischaracterization of the channel mix which I assume you disagree with, but I'm curious whether there is any unique risk with having that much business and potential additional growth in Medicare versus other channels?

45.     The news of the Company's increasing exposure to Medicare from Acthar caused Mallinckrodt's stock price to decline an additional 9.1% from a close of $57.67 per share on November 28, 2016, to close at $52.42 per share on November 29, 2016.

46.     The next day, the Company effectively admitted the falsity of Trudeau's October 6, 2015 statements, telling investors at a Piper Jaffray Healthcare conference that its reimbursement level from Medicare alone was in the "mid-40s." Specifically, O'Neill stated:

"Our portfolio has shifted a little bit into the mid-40s as it relates to Medicare reimbursement for the product versus where it was a year and a half, two years ago which was more in that low, mid-30s."

47.     The truth about the Company's illegal anticompetitive activities was revealed on January 18, 2017, when the FTC announced that Mallinckrodt had agreed to a joint settlement with the FTC and several states arising from the FTC's investigation and lawsuit into Questcor and Mallinckrodt's efforts to prevent a cheaper competitor drug, Synacthen, from competing the market. As part of the settlement, Mallinckrodt agreed to pay $100 million and agreed to license Synacthen to a competitor to pursue FDA approval for two of Acthar's primary indications, infantile spasms and nephrotic syndrome.

48.     The news of the settlement, and the fact that Mallinckrodt would lose its monopoly in the U.S., caused the Company's stock price to decline 5.85% from a close of $49.42 per share on January 17, 2017, to close at $46.53 per share on January 18, 2017.

## CAUSATION AND ECONOMIC LOSS

49.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Mallinckrodt securities and operated as a fraud or deceit on Class Period acquirers of Mallinckrodt's securities by failing to disclose material adverse facts about the Company's business, operations, and prospects. Ultimately, however, when Defendants' prior misrepresentations and fraudulent conduct came to be revealed and was apparent to investors, shares of Mallinckrodt declined precipitously – evidence that the prior artificial inflation in the price of Mallinckrodt's securities was eradicated. As a result of their acquisitions of Mallinckrodt securities during the Class

Period, Plaintiffs and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

50.     Defendants' false and materially misleading statements had the intended effect of causing Mallinckrodt's securities to trade at artificially inflated levels throughout the Class Period - reaching a Class Period high of over $134 per share on March 23, 2015.

51.     On November 16, 2016, however, as investors began to learn the truth about the Company, shares of the Company sharply declined. Defendants' belated disclosures had an immediate, adverse impact on the price of Mallinckrodt securities. As this adverse information became known to investors, the prior artificial inflation began to be eliminated from Mallinckrodt's share price and were damaged as a result of the related share price decline.

52.     The declines in the price of Mallinckrodt's securities following revelation of the truth through corrective disclosures were direct results of the nature and extent of Defendants' fraud being revealed to investors and to the market. The timing and magnitude of the decline in price of Mallinckrodt's securities negates any inference that the losses suffered by Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to Defendants' fraudulent conduct. During the same period in which Mallinckrodt's share price fell over 30% as a result of Defendants' fraud being revealed, the Standard & Poor's 500 securities index increased in value by approximately 10%.

53.     The economic loss, *i.e.* damages suffered by Plaintiffs and other members of the Class, was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Mallinckrodt's securities and the subsequent significant decline in the value of the Company's securities when Defendants' prior misstatements and other fraudulent conduct was revealed.

## ADDITIONAL SCIENTER ALLEGATIONS

54.     As alleged herein, Defendants acted with scienter in that each Defendant knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Mallinckrodt, their control over, and/or receipt and/or modification of Mallinckrodt's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Mallinckrodt, participated in the fraudulent scheme alleged herein.

55.     Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because this: (i) deceived the investing public regarding Mallinckrodt's business, operations, management and the intrinsic value of Mallinckrodt's revenues, assets and securities; (ii) enabled Defendants to artificially inflate the price of Mallinckrodt securities; (iii) caused Plaintiffs and other members of the Class to acquire Mallinckrodt securities at artificially inflated prices; and (iv) caused damage to holders of Mallinckrodt securities when adverse information became known to investors and the prior artificial inflation began to be eliminated from Mallinckrodt's share price.

### Applicability Of Presumption Of Reliance:
### Fraud-On-The-Market Doctrine

56.     At all relevant times, the market for Mallinckrodt securities was an efficient market for the following reasons, among others:

(a)     Mallinckrodt's stock met the requirements for listing and was listed and actively traded on the NYSE, a national market exchange which is a highly efficient and automated market;

(b)     As a regulated issuer, Mallinckrodt filed periodic public reports with the SEC and NYSE;

(c)     Mallinckrodt regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Mallinckrodt was followed by several securities and debt analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s), each of which was publicly available and entered into the public marketplace.

57.     As a result of the foregoing, the market for Mallinckrodt securities promptly digested current information regarding Mallinckrodt from all publicly available sources and reflected such information in the price of Mallinckrodt securities. Under these circumstances, all acquirers of Mallinckrodt securities during the Class Period suffered similar injury through their acquisitions of Mallinckrodt securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

58.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking

statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Mallinckrodt who knew that the statement was false when made.

## BASIS OF ALLEGATIONS

59.     Plaintiffs have alleged the following based upon the investigation of Plaintiffs' counsel, which included a review of SEC filings by Mallinckrodt, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## FIRST CLAIM

**Violation Of Section 10(b) Of
The Exchange Act And Rule 10b-5
Promulgated Thereunder Against All Defendants**

60.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

61.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Mallinckrodt's business, operations, and management; (ii) enable Defendants to

artificially inflate the price of Mallinckrodt securities; and (iii) cause Plaintiffs and other members of the Class to acquire Mallinckrodt securities at artificially inflated prices.

62.     Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the acquirers of the Company's securities in an effort to maintain artificially high market prices for Mallinckrodt's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

63.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Mallinckrodt as specified herein.

64.     Defendants employed devices, schemes and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of Mallinckrodt's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Mallinckrodt and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the acquirers of Mallinckrodt securities during the Class Period.

65.     Defendant Trudeau's primary and controlling person liability arises from the following facts: (i) Trudeau was a high-level executive and director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) Trudeau, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) Trudeau was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) Trudeau was aware of the Company's dissemination of information to the investing public which he knew or recklessly disregarded was materially false and misleading.

66.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Defendants' material misrepresentations and/or omissions were made knowingly and/or recklessly for the purpose and effect of concealing Mallinckrodt's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by refraining from taking those steps necessary to discover whether those statements were false or misleading.

67.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Mallinckrodt securities were artificially inflated during the Class Period. In ignorance of the fact that market

prices of Mallinckrodt's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Mallinckrodt securities during the Class Period at artificially high prices and were damaged thereby.

68.     At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Mallinckrodt, which was not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Mallinckrodt securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

69.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

70.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective acquisitions and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against Defendant Trudeau

71.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

72.     Defendant Trudeau acted as a controlling person of Mallinckrodt within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level position, his ownership and contractual rights and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Defendant Trudeau had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Defendant Trudeau was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

73.     In particular, Defendant Trudeau had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

74.     As set forth above, Mallinckrodt and Defendant Trudeau each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of his position as a controlling person, Defendant Trudeau is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their acquisitions of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiff and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: March 13, 2017                          Respectfully submitted,


                                               /s/ Michael G. McLellan
                                               Michael G. McLellan (D.C. Bar # 489217)
                                               **FINKELSTEIN THOMPSON LLP**
                                               James Place
                                               1077 30th Street, N.W., Suite 150
                                               Washington, D.C.  20007
                                               Telephone: 202-337-8000
                                               Facsimile: 202-337-8090
                                               Email: mmclellan@finkelsteinthompson.com


                                               Kim Miller
                                               **KAHN SWICK & FOTI, LLC**
                                               250 Park Ave., Suite 2040
                                               New York, NY 10177
                                               Telephone: (212) 696-3730
                                               Facsimile: (504) 455-1498
                                               Email: kim.miller@ksfcounsel.com


                                               Lewis Kahn
                                               **KAHN SWICK & FOTI, LLC**
                                               206 Covington Street
                                               Madisonville, Louisiana 70447
                                               Telephone: (504) 455-1400
                                               Facsimile: (504) 455-1498
                                               Email: lewis.kahn@ksfcounsel.com


                                               Attorneys for Plaintiffs